## Stepp v. Commonwealth.

(Two Cases.)

(Decided November 6, 1931.)

W. A. DAUGHERTY for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE DRURY—Affirming.

On Sunday, October 26, 1930, Ingram Stepp shot and killed John Clay and his brother Willie Clay. On November 5, 1930, he was indicted for the murder of Willie Clay, and, when he was tried therefor, his plea was self-defense, but he was convicted of manslaughter on December 3, 1930, and his punishment fixed at 21 years in the penitentiary.

December 1, 1930, Ingram Stepp and his son, Jonah Stepp, were indicted for the murder of John Clay, and, when Ingram Stepp was tried under that indictment January 19, 1931, he again pleaded self-defense, but he was convicted of manslaughter, and again his punishment was fixed at 21 years in the penitentiary, and by the judgment of the court entered pursuant to section 288 of the Criminal Code of Practice his punishment under this second conviction is not to begin until after the conclusion of his punishment under the first one. His motions for new trial were overruled, and he has prosecuted an appeal in each case, which we shall dispose of in one opinion.

As one of his grounds for reversal is that these verdicts are flagrantly against the evidence, we shall first give a brief outline of it.

These homicides occurred at the home of Jack Lafferty on the upper reaches of Sowder's creek in Floyd county, at about midnight Sunday night or possibly in the early hours of Monday. Floyd Stepp and Miss Barbarra Lafferty had been to church on that Sunday, and he came home with her, arriving there some time in the late afternoon. The mother of Miss Barbara is dead, so soon after she reached home she and her cousin Mabel Lafferty prepared supper, and, while they were eating it, Willie Clay came in, and his conduct was such that soon he and Floyd Stepp got into a difficulty in which each shot and seriously wounded the other.

The wounded men were brought into the house and put in separate beds in the same room. Medical aid was sent for, and the respective families of the two men were

summoned. The roads were very poor, it was quite dark, and the summoned relatives began to filter in about 9 p. m. The first to arrive was John Clay, and in the course of an hour or so then came Jonah Stepp, a brother of Floyd, and about midnight Ingram Stepp, the father of Floyd, arrived. He spoke to the assembly when he entered the house, and passed into the room where his son Floyd Stepp then lay, mortally wounded, in one bed, and Willie Clay, seriously wounded lay in another. The room was dimly lighted by a smoldering fire and perhaps by a lantern hanging on the wall.

Ingram Stepp looked around the room and said, "Where is the boy that done this shooting?" and John Clay said, "He is over here," and he said, "I will take him to jail." John got off the bed and said, Mr. Stepp you can't do that, the boy is shot and shot bad," and he said, "I will see whether he is or not."

Aris Thompson's testimony about what next occurred is:

"I spoke and said, 'For God's sake don't do that, he is already killed I think.' He started over to the bed and said, 'I will see about that,' and when he bent over like he was going to take hold of the cover, or the boy, I put my hand on his left shoulder, didn't push, just laid my hand upon his shoulder, I was standing there, and begged him not to do that, and about that time John Clay sitting on his right raised up, and said, 'Lord have mercy don't do that, he is already killed,' he said, 'Oh God-damn you,' and kindly shoved John, he didn't strike him, just shoved him he started to fall when he jerked his hand back, he come with his pistol and shot John.

"Q. What position was John in at the time he shot him? A. Falling or staggering.

"Q. What was John doing at the time Ingram shot him? A. Never saw him do a thing.

"Q. Do you see his hands? A. Yes, sir.

"Q. How did he have his hands? A. When he got up his hands dropped down.

"Q. When staggering about there? A. He threw his hands up.

"Q. Where did he shoot him the first time? A. Best I could see the stomach.

"Q. Did he continue to fall from the time Stepp shoved him—till he hit the floor? A. Yes, sir, the second shot hit him in the neck.

"Q. What did he do then? A. Turned around and shot Willie Clay.

"Q. How close was he to Willie Clay at the time he shot him? A. Two steps.

"Q. Did he walk closer up to Willie to shoot him? A. Kindly turned around on his left foot.

(*This witness used the word* "kindly" *twice in the quoted evidence. We find this word so used in much of the testimony coming from this section of Kentucky, and as so used it means* "in a way," "in a manner" *or* "after a fashion." *It is sometimes written* "kind o' " *sometimes* "kinder," *sometimes* "kinda" *and in David Copperfield, Dickens writes it* "kiender." *Mrs. Harriet Beecher Stowe wrote it* "kind o' " *and Sylvester Judd in Margaret wrote it* "kinder.")

"Q. What was Willie Clay doing at the time he shot him? A. Not anything, never saw him do a thing.

"Q. Did you hear him say anything—at the time the first shot fired? A. Women and children screaming you couldn't hardly hear anything.

. . .

"Q. What did Stepp do after the shooting was over? A. Not anything after he stepped to the door of the upper room, he said, 'If any one else has got anything to do with it, say it.'

"Q. Then what did he do? A. Turned around and left the house.

"Q. Did he say anything to his son there or not? A. Not as I heard of."

Practically the same account of it is given by other witnesses for the commonwealth. The defendant says in speaking of the shooting:

"I went in and said, 'Howdy do,' and said, 'Where is the man that done this shooting,' or 'Boy' one, I don't recollect, some of them spoke and said, 'He is over here shot too,' and I said, 'I want to see how bad he is shot, I am going to take him to jail, if he is able to do,' I walked over towards the bed—

"Q. At that time had John Clay got up off the foot of the bed? A. I walked over straight over, and about the time I got over to the bed he jumped up shoved me by my shoulder, I don't know how

many times, and when he done that, when I turned my head, I saw him coming with his gun, out of the right overcoat pocket, I had my gun in belt holster down here, I pulled my gun and fired.

"Q. How soon did you shoot, after you saw him coming with that pistol? A. As soon as I could get hold of it.

"Q. How many shots did you fire at John Clay? A. Two shots.

"Q. What happened after you fired those two shots? A. This man fell and I heard a noise back here in this bed, I wheeled around and saw this man shoving the cover aside, I fired two shots, I thought he was coming with a gun, looked like it from the way he was shoving the cover, I thought he was coming with a gun and I fired two shots at him."

Further in this evidence he said:

·"I recollect some folks starting out, I turned around and told them I didn't have nothing against them, when they started out."

Defendant produces two witnesses who say a pistol was found in the bed clothing of Willie Clay's bed when it was stripped, but the commonwealth showed by several witnesses that Willie Clay's pistol had been taken from him and carried away when he was shot in the afternoon. It is admitted a pistol was in the overcoat pocket of John Clay, when he fell, the butt down and the barrel sticking up. It was shown that after the shooting the defendant said:

"If any of your people has got anything to say, let's hear it."

A few moments' reflection on what the defendant did will show this verdict is amply sustained. He shot John Clay when he had his hands up, then turned and shot Willie Clay as he lay in bed, shot through the arm and shot through the bowels, than which there is no more sickening wound. When he had killed these two men, he turned to the others and said:

"If anybody else got anything to say let him say it, I am cleaning up on the one that shot my blood."

After the shooting, when those present were hollering and screaming and fleeing from the house, he said:

"There is no use of you people running off, I haven't got nothing against none of you people." The use of these words clearly shows he did have something against the men he shot.

His only grounds for reversal in this Willie Clay case are that he was entitled to a peremptory instruction and the verdict is flagrantly against the evidence, and simi-lar grounds are urged in the John Clay case. These grounds are absolutely without merit.

### The John Clay Case.

The defendant urges three grounds for reversal, one is the same as the two urged in the Willie Clay case, and has not enough merit to justify discussing it, and the others are:

"1st. Because the court erred in refusing to allow the defendant to introduce to the jury certain relevant and competent evidence offered by him upon his trial, to which ruling of the court the de-fendant at the time excepted.

"2nd. Because the court erred in permitting and allowing the Commonwealth to introduce cer-tain irrelevant, immaterial, and incompetent evi-dence over the objection of the defendant and to his prejudice.

The basis of the first ground is a desire of the de-fendant to develop the details of the shooting in the afternoon in which Floyd Stepp and Willie Clay shot each other, but it was proper to not allow that to be done, as the defendant was then 15 miles away entirely ignorant thereof, and in no way involved therein.

The basis of his second ground is that the court allowed the witnesses to tell briefly what John Clay said and did when he came there that evening, before Ingram Stepp came, but each time the court gave the jury an admonishment, of which this one is fairly illustrative:

"Any witness testifying about any conversa-tion between John Clay, Floyd Stepp and Willie Clay not in the presence of Ingram Stepp can't be considered by you as against Ingram Stepp unless it bears upon the attitude of John Clay at the time he had that difficulty with Ingram Stepp, that is the only purpose for which you can consider it in the case."

This is not erroneous. Here we have the lives of three valuable young men, John Clay, Willie Clay, and Floyd Stepp, snuffed out, the children of the first two made fatherless, and a man after 48 years of upright living sent to the penitentiary for 42 years, all because of the pernicious practice of carrying pistols.

Both judgments are affirmed.